LOUIS M. CORRATTI, SR., as Administrator of the Estate of ANNA M. CORRATTI, Deceased, Appellant, *v.* STATE OF NEW YORK, Respondent. (Claim No. 36589.)

LOUIS CORRATTI, JR., an Infant, by LOUIS M. CORRATTI, SR., His Guardian ad Litem, Appellant, *v.* STATE OF NEW YORK, Respondent. (Claim No. 36590.)

ALMA B. CORRATTI, Appellant, *v.* STATE OF NEW YORK, Respondent. (Claim No. 36610.)

Third Department, December 27, 1963.

*Connor, Millman & Connor* (*William E. J. Connor* and *Jean S. Toigo* of counsel), for appellants.

*Louis J. Lefkowitz, Attorney-General* (*Jean M. Coon* and *Paxton Blair* of counsel), for respondent.

*Per Curiam.* In descending a long hill on State Highway Route 66 on February 12, 1959 an automobile driven by claimant

Alma B. Corratti skidded on ice, went out of control, and struck a tree. Her young child Anna Marie died as a result of injuries; and both Mrs. Corratti and another child, Louis, were injured. The Court of Claims after a trial has dismissed the three resulting claims on the ground the State was not negligent.

There was some intimation in the court's opinion that the Judge may have felt the driver was negligent, but there is no finding to this effect and it would in any case be immaterial in the other two claims. The basic issue on appeal is the State's negligence.

Mrs. Corratti was proceeding from Hudson to Chatham and in this area Route 66 runs in a southwesterly to northeasterly direction. It will be convenient to describe sites from the left or right of the driver moving toward Chatham in a northeasterly direction.

On the left side of the road on the descending grade of the hill the State for many years had maintained a drainage ditch to carry off surface waters. The ditch ranged in depth from 9 to 18 inches. Near the bottom of the hill a driveway was maintained from the highway on the left to the premises of one Cooley.

This entrance driveway covered over the ditch area and was flush with the highway; but a pipe was laid under the driveway to carry the water from the ditch under the driveway area. The pipe then made a right angle and continued across under the whole highway where it emptied out on the right side of the highway.

This pipe was connected also with a pipe which, from a grating on the private driveway, also could drain the private driveway area. The resulting pipe structure was " T " shaped, permitting drainage both from the ditch, which followed the road on its left side, and the drainage from the grate to pass together under Route 66 to the right side.

There is adequate proof that the State regularly maintained and serviced the drainage ditch itself on the downgrade on the left side of the road to the point where it reached the pipe; but there is no proof that it undertook to keep the pipe under the driveway and the highway open. On the other hand there is strong proof that the pipe had become clogged by long accumulation of material and was not functioning.

Although, as the State points out, the observations by claimants' engineer, on which proof of the condition of the pipe was based, were made almost two months after the accident (April 8), what was seen and the witness' evaluation of what was seen make it clear that the pipe had been clogged at the time of, and long before, the accident.

On top of the debris which accumulated at the pipe opening there was a deposit of soil on which grass had started to grow which was "comparatively heavy in many places" and had been self-seeding apparently for "two years". At the ditch on the right side of the road at the outlet "there was a pile of gravel in front of the head wall". The opinion of claimants' engineer was that this condition caused water from the drainage ditch to flow over the highway.

Nor does the State undertake to show that the inlet or the outlet of the pipe serving the drainage ditch was open February 12, 1959. The State argues on the basis of photographs taken on the day of the accident that if water had been flowing over and onto the road from the ditch at the point where the driveway blocked the drainage, the ditch would have been full of water or ice at that point and that the photographs do not indicate ice or water at that level.

Some of the photographs seem to show the level of ice in the ditch below the top; but other photographs are not clear on this and would not exclude overflow of water under melting conditions. Moreover, direct observations by witnesses at the scene of the accident indicate the presence of ice caused by a flow from the left to the right side of the road.

The Coroner testified that from the left side just above the scene of the accident "the road was slushy across the entire highway"; the "slush" and a "slushy condition" ran "from northwest to southeast across the highway". It ran from "that point" where there was a "sluice or ditch" across the road. The ice on the right side of the road was "very thick". There "was no sand".

A trooper testified that the ice along the eastbound lane ran 70 to 75 feet "along the south side of that driveway". It "was very slippery". He observed "no sand" on the ice. There is other proof from which the inference is rather strong that a wet and icy condition of the road was attributable to the maintenance of the ditch-fed drainage system. A lawyer living in Chatham, driving the road frequently, "observed for many years that water was flowing" from the left side "over toward" the right side. "I have observed that condition during winter and summer" and "in the winter and springtime that there would be a ridge of ice across the highway at the sluiceway from the house side of the property [the left] over to the barn side of the property [the right]".

Another witness observed that in the morning before the accident "there was ice cross the road" at that point and that "the ice extended out of a sluiceway". He said further that

" [t]he ice came across the road from that red garage and across the sluiceway about in where Cooley's cement block barn sets." (I.e., from left to right.) He further testified he had observed that " the roads were dry all but that spot." This witness had for some time previously resided in the neighborhood, and he testified " after the [Cooley] barn was built" he had noticed that " there was ice always every winter across the road."

The proof in the record leads us to reach a different conclusion on the facts from that reached by the Court of Claims and to hold the State negligent. It is clear that a dangerous condition existed on this hill creating an undue ice hazard existing long enough to give notice and to require either that the cause be corrected or that sanding adequate to protect drivers be carried out.

It is manifest that the engineers who designed the pipe system under the driveway and the highway were of opinion that it was necessary to provide drainage from the ditch. The rather persuasive proof given by several witnesses suggests both the necessity for it and the fact it did not work; and the proof it was not functioning on February 12, 1959 is very strong. Although there is testimony that the whole road was sanded on the morning of this accident, it seems clear there was no sand at this slippery point when the accident occurred.

The Attorney-General's brief argues that the Court of Claims " was guilty of no abuse of discretion " in deciding the facts in favor of the State. We do not have to go that far to revise a factual judgment of the Court of Claims. If we are of opinion the decision is against the weight of the evidence as we review it, our duty is to make an appropriate different finding.

An unusually long time (over nine months) elapsed between the hearing of the case and the decision of the Judge, and there are intimations in the opinion which suggest some judicial misapprehension of the actual record, e.g., " [t]here was no testimony from anyone directly that the culvert was clogged on the date of the accident, or even before that time "; and a statement indicating that the location of the grating on the driveway had some important relevance to the question of the State's negligence. We find the State was negligent, and that both the driver and the children were not negligent.

Decedent Anna Marie Corratti was between two and three years old. She died about two hours after the accident. She was conscious for a short time after the accident and apparently lost consciousness on the way to the hospital. Damage for conscious pain and suffering is fixed at $1,000; and for death, including monetary expenses, $7,500. Damages in the case of

.. 

Louis Corratti, Jr., are fixed in the sum of $8,500; and for damages arising from his injury in the case of his father, Louis Corratti, Sr., $1,000. Damages in the case of Alma B. Corratti, are fixed in the sum of $750.

The judgment of the Court of Claims should be reversed on the law and the facts and judgment directed for the respective claimants in accordance with this opinion, with costs to appellants. The order should be settled.

BERGAN, P. J., GIBSON, HERLIHY, REYNOLDS and TAYLOR, JJ., concur.

Judgment of the Court of Claims reversed on the law and the facts and judgment directed for respective claimants in accordance with the opinion herein, with costs to appellants. Settle order on notice.